O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DIGITECH IMAGE TECHNOLOGIES, LLC,<br><br>                Plaintiff,<br>   v.<br>PENTAX RICOH IMAGING CO, LTD. et al.,<br><br>                Defendants. | Case No. 8:12-cv-1689-ODW(MRWx)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT [31]** |

## I. INTRODUCTION

Under 35 U.S.C. § 101, patent claims must be directed to one of the four patent-eligible subject-matter categories: processes, machines, manufactures, or compositions of matter. Inventions that fit within one or more of the statutory categories are nonetheless patent ineligible if they are coextensive with laws of nature, natural phenomenon, or abstract ideas, unless the inventions include substantive limitations that would add "significantly more" to the underlying principles. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1294 (2012).

Plaintiff Digitech Image Technologies LLC's '415 Patent claims a device profile and a method of generating a device profile.[1] A device profile describes the

---

[1] U.S. Patent No. 6,128,415, claims 1–6, 9, 10–15, and 26–31.

color and spatial properties of a device so that a processed image can be more accurately captured, transformed, or rendered, minimizing color and spatial distortions produced by an imaging device. ('415 Patent 1:8–11; 1:32–34.) Although past attempts to correct these image distortions are not new, they have been device dependent. (*Id.* at 1:35–36.) The '415 Patent seeks to improve digital-imaging processing through use of device-independent device profiles by applying a device-independent paradigm for the spatial characterization. (*Id.* at 1:64–2:1; 2:4–9.)

Defendants assert that these claims either fall outside the four subject-matter categories or merely describe an ineligible abstract idea.[2] For the reasons discussed below, the Court finds that the asserted claims are patent ineligible and **GRANTS** Defendants' Motion for Summary Judgment of Invalidity.[3] (ECF No. 31.)

## II. LEGAL STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and identify specific facts through admissible evidence that show a genuine issue for trial. *Id.*; Fed. R. Civ. P. 56(c). Conclusory or speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

---

[2] Defendants FUJIFILM Corp.; Sigma Corp.; Sigma Corp. of America; Pentax Ricoh Imaging Co., Ltd.; Pentax Ricoh Imaging Americas Corp.; Ricoh Company, Ltd.; Ricoh Americas Corp.; and Konica Minolta Business Solutions, U.S.A., Inc. bring this Motion for Summary Judgment. The Court enters this order in each of the separate cases as well as in the lead case: 8:12-cv-1324-ODW(MRWx); 8:12-cv-1679-ODW(MRWx); 8:12-cv-1681-ODW(MRWx); 8:12-cv-1689-ODW(MRWx); 8:12-cv-1694-ODW(MRWx).

[3] Having considered the papers filed in support of and in opposition to this Motion, the Court deems the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; L.R. 7–15.

A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### III. DISCUSSION

"Anything under the sun" may be considered an invention, but only those satisfying the conditions under § 101 are patentable. *Bilski v. Kappos*, 130 S. Ct. 3218, 3249 (2010). Determinations of patent eligibility are questions of law and require a two-step analysis. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011); *Bilski*, 130 S. Ct. at 3225. First, the claimed invention must fall within one of the four eligible subject-matter categories: processes, machines, manufactures, or compositions of matter. *Bilski*, 130 S. Ct. at 3225; 35 U.S.C. § 101. Second, if the claimed invention falls within one of the four categories, it still must not wholly embrace one of the three judicially recognized exceptions: laws of nature, physical phenomena, and abstract ideas. *Bilski*, 130 S. Ct. at 3225.

All inventions, at some level, "embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 132 S. Ct. at 1293. So applying the judicially recognized exceptions too broadly would "eviscerate patent law." *Id.* And though a practical application of an abstract idea to a structure or process may be patented, "one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Id.* at 1294. Thus, the goal of § 101 is to guard against the "wholesale preemption of fundamental principles," while looking beyond mere claim-drafting strategies such as "highly stylized language, hollow field-of-use limitations,

or the recitation of token post-solution activity." *CLS Bank Int'l v. Alice Corp.*, No. 2011-1301, 2013 U.S. App. LEXIS 9493, at *28, 30 (Fed. Cir. May 10, 2013) (en banc) (Lourie, J., concurring).

The Supreme Court has eschewed the Federal Circuit's formulas for patent eligibility like the machine-or-transformation test and has directed courts to employ a "flexible, claim-by-claim approach to subject-matter eligibility that avoids rigid line drawings." *Id.* at *30–31. And as with all invalidity inquiries, a § 101 eligibility determination presupposes that a patent is entitled to a presumption of validity. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2252 (2011); 35 U.S.C. § 282. Hence, a court must carefully consider "meaningful limitations" that prevent a claim from covering every practical application of a fundamental concept and preserve the claim's validity. *CLS Bank*, 2013 U.S. App. LEXIS 9493, at *29.

Although the parties do not contend that claim construction is necessary nor assert any particular constructions, the Court is obligated to first consider this issue. *State St. Bank & Trust. Co. v. Signature Fin. Grp.*, 149 F.3d 1368, 1370 (Fed. Cir. 1998) (explaining that the issue of § 101 patent eligibility is "a matter of both claim construction and statutory construction"). The only term needing construction in this § 101 analysis is the term "device profile," found in every asserted claim.

**A. Claim construction**

Claim construction is a question of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc). In construing claim terms, the Court must begin with an examination of the claim language itself. *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1284 (Fed. Cir. 2011); *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim.").

/ / /

1    The terms used in the claims are generally given their "ordinary and customary
2 meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en
3 banc). This "ordinary and customary meaning" is the meaning as understood by a
4 person of ordinary skill in the art in question at the time of the invention. *Phillips*,
5 415 F.3d at 1313. A patentee is presumed to have intended the ordinary meaning of a
6 claim term in the absence of an express intent to the contrary. *Id*. In some instances,
7 a term's ordinary meaning may be readily apparent, in which case the court need only
8 apply the widely accepted meaning of commonly understood words. *Acumed LLC v.
9 Stryker Corp.*, 483 F.3d 800, 805 (Fed. Cir. 2007).

10   The person of ordinary skill in the art is deemed to read the claim term in the
11 context of the entire patent. *Phillips*, 415 F.3d at 1313. Thus, claim terms are
12 interpreted in light of the intrinsic evidence of record, including the specification,
13 written description, drawings, and prosecution history. *Teleflex, Inc. v. Ficosa N. Am.
14 Corp.*, 299 F.3d 1313, 1324–25 (Fed. Cir. 2002).

15   Courts may also rely on extrinsic evidence, such as expert testimony,
16 dictionaries, and learned treatises, to better understand the underlying technology and
17 to determine what a person of ordinary skill in the art would understand the claim
18 terms to mean. *Phillips*, 415 F.3d at 1317–18. But while extrinsic evidence can be
19 useful, it is less reliable and less significant than the intrinsic record in determining the
20 meaning of claim language. *Id*. at 1318. Particularly, expert testimony should be
21 discounted if it is "clearly at odds with the claim construction mandated by the
22 claims" or are merely conclusory, unsupported assertions. *Id.*

23   The '415 Patent describes a digital-image processing system comprising a
24 source (image-acquisition) device, an image processor, and an output device. ('415
25 Patent 2:49–63.) Color-characteristic and spatial-characteristic information relating to
26 the source and output devices is passed to the image processor along with image data,
27 allowing the processor to more accurately capture, transform, or render an image.
28 ('415 Patent 2:49–3:11.) This is represented in the following diagram:

('415 Patent, Fig. 1.)

The specification refers to a tagged file structure as a device profile. ('415 Patent 1:66–67.) This device profile can include a "characterization of a device's image pixel data in device independent color space" as well as "spatial characteristics" of the device. ('415 Patent 1:64–2:3.) It is clear that these characteristics are just numerical data, whether raw or calculated. ('415 Patent 1:55–64 (color characteristics can be represented by "image pixel data (digits) in a device independent color space—e.g. CIE L*a*b* or CIE XYZ"); '415 Patent 3:12–31 (spatial characteristics can be represented by mathematical functions describing "added noise and image signal transform characteristics" or "a gray level dependent additive noise").)

The Court finds no reason to construe the term "device profile" to mean anything other than its plain and ordinary meaning. Synonyms that may be appropriate are tagged file structure,[4] data set, or paradigm—but these do no better job at describing "device profile" than its plain and ordinary meaning. What is certain,

---

[4] Digitech contends that a device profile can exist as "a 'tag' appended to a digital image obtained using a digital image processing system," and is therefore a tangible object. (Opp'n 8.) There are two problems with this statement. First, the specification points out that the characterization of a device "is commonly codified in a tagged file structure, referred to as a device profile, that accompanies the digital imaging device." Thus, it is the imaging device that has this device profile or tag; the tag is not part of a digital image. ('415 Patent 1:64–2:1.) Second, while a tag may exist as an appendage of a digital image, it is not a tangible object. A case may be made that data describing a digital image should be considered tangible. *See In re Abele*, 684 F.2d 902, 908–09 (C.C.P.A. 1982) (holding that electronic transformation of data into a visual depiction of body tissues satisfied the transformation test for patent eligibility). But data describing a device profile is many shades less tangible—not only does it not *represent* anything tangible, it only represents intangible properties of a device.

and most relevant in this § 101 analysis, is that the meaning of "device profile" does not connote being a physical object, comprising a physical component, or having a physical manifestation. *See In re Ferguson*, 558 F.3d 1359, 1365–66 (Fed. Cir. 2009) ("Paradigm claims do not recite a concrete thing, consisting of parts, or of certain devices and combination of devices." (internal quotation marks omitted)).

Turning to the asserted claims, these can be divided into two categories of claims: ones for a device profile (claims 1–6, 9, and 26–31); and ones for a method of generating a device profile (claims 10–15). The Court first addresses the device-profile claims, and then proceeds to analyze the remaining claims.

**B.  The device-profile claims (claims 1–6, 9, and 26–31) do not fall within any of the four statutory categories for patent eligibility**

Claims 1 and 26 are the two independent claims of the '415 Patent directed to a device profile:

> 1.  A device profile for describing properties of a device in a digital image reproduction system to capture, transform or render an image, said device profile comprising:
>     first data for describing a device dependent transformation of color information content of the image to a device independent color space; and
>     second data for describing a device dependent transformation of spatial information content of the image in said device independent color space.
>
> 26.  A device profile for describing properties of a device in a digital image reproduction system to capture, transform or render an image, said device profile comprising data for describing a device dependent transformation of spatial information content of the image to a device independent color space, wherein through use of spatial stimuli and device response for said device, said data is represented by spatial characteristic functions.

('415 Patent 5:33–41; 7:8–15.) Section 101 demands that the claimed invention be a process, machine, manufacture, or composition of matter. *Bilski*, 130 S. Ct. at 3225. Claims 1 and 26 are none of these.

Claim 1 describes a device profile. This profile comprises a first piece of data relating to color information, and a second piece of data relating to spatial information. Nothing in claim 1 describes anything tangible.

To qualify as a machine under § 101, it must be a "concrete thing." *In re Nuijten*, 500 F.3d 1346, 1355 (Fed. Cir. 2007). Intangible things such as "a transitory signal made of . . . electromagnetic variances . . . [may be] physical and real, [but] it does not possess concrete structure in the sense implied" under § 101. *Id.* A device profile is nothing more than an intangible set of data—it is nothing more than numbers. *See In re Warmerdam*, 33 F.3d 1354, 1362–63 (Fed. Cir. 1994) (holding that a "data structure" relating to a hierarchy of bubbles was patent ineligible because it only referred to the manipulation of ineligible, purely mathematical ideas).

Similarly, a manufacture must be tangible. A manufacture refers to articles resulting from processing materials to give these materials new forms, qualities, properties, or combinations. *Id.* at 1356. Notably, the term "manufacture" as used in the statute is a noun. *Bayer AG v. Housey Pharm., Inc.*, 340 F.3d 1367, 1373 (Fed. Cir. 2003). So, "manufacture" does not refer to the making or modifying of data, signals, or other intangible objects. *See Nuijten*, 500 F.3d at 1356–57. A device profile is just data, something intangible and not considered a manufacture. And the fact that a device profile is made of a color component and a spatial component does not qualify it as a manufacture—a combination of intangible objects does not create a tangible one.

Further, a device profile is not a composition of matter. A composition of matter is defined as "all compositions of two or more substances and . . . all composite articles, whether they be the results of chemical union, or of mechanical mixture, or whether they be gases, fluids, powders or solids." *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980) (internal quotation marks omitted). Digitech contends that a device profile is a composition of matter but fails to explain how that is so. (Opp'n 19.) The key word in this category is "matter"—meaning that the claimed object must be

tangible. A device profile, however composed of different bits of data, cannot constitute matter.

Finally, a device profile is not a process. A process requires action; it is "an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing." *Gottschalk v. Benson*, 409 U.S. 63, 70 (1972) (internal quotation marks omitted). Digitech does not argue that a device profile is a process, and the Court sees no reason how it could be. Thus, failing to fall within one of the four patent-eligible subject-matter categories, claim 1 is invalid under § 101.

In the same way, the device profile in claim 26 fails to fall within one of the four statutory categories. Claim 26 differs from claim 1 in that it only includes claim 1's "second data" for describing a device-dependent transformation of spatial-information content of a image to a device-independent color space. ('415 Patent 7:8–13.) Claim 26 also adds an additional limitation over claim 1 by defining that the data is represented by spatial-characteristic functions through the "use of spatial stimuli and device response" for the device. ('415 Patent 7:13–15.) But though claim 26 recites verbs "use" and "is represented," this claim is not a process claim; it is a product-by-process claim, "in which the product is defined at least in part in terms of the method or process by which it is made." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1315 (Fed. Cir. 2006) (internal quotation marks omitted). Product-by-process claims are directed to the ultimate product, and not the underlying process. *Nuijten*, 500 F.3d at 1355. Therefore, claim 26's additional limitation is insufficient to propel the claim into one of the four statutory categories and the claim must be found invalid.

For the same reasons, dependent claims 2–6, 9, and 27–31 cannot rectify the patent-ineligibility problem of their independent claims 1 and 26. These dependent claims only add limitations and make them at most, product-by-process claims. These additional limitations cannot transmute intangible device profiles into patent-eligible subject matter. It follows that these dependent claims must also be found invalid.

**C.  The device-profile method claims (claims 10–15) do not describe a patent-eligible process because they fail the machine-or-transformation test**

Unlike claims 1 and 26, claim 10 is a method claim. Claim 10 describes a method of generating device profiles that closely mirrors claim 1:

> 10.  A method of generating a device profile that describes properties of a device in a digital image reproduction system for capturing, transforming or rendering an image, said method comprising:
> generating first data for describing a device dependent transformation of color information content of the image to a device independent color space through use of measured chromatic stimuli and device response characteristic functions;
> generating second data for describing a device dependent transformation of spatial information content of the image in said device independent color space through use of spatial stimuli and device response characteristic functions; and
> combining said first and second data into the device profile.

('415 Patent 6:1–16.)

The parties dispute whether claim 10 falls within the process category of § 101. One important and useful tool to determine whether an invention is a patent-eligible process is the machine-or-transformation test. *Bilski*, 130 S. Ct. at 3227. Though it is not the sole test for patent eligibility, it has been historically true that inventions failing the machine-or-transformation test were rarely granted patents. *Id.* Under this test, a claimed process could be patent-eligible only if "(1) it is tied to a particular machine or apparatus; or (2) it transforms a particular article into a different state or thing." *CyberSource*, 654 F.3d at 1369. But passing this test is no guarantee for patentability; not everything that produces a "useful, concrete, and tangible result" is patentable. *Bilski*, 130 S. Ct. at 3259 (Breyer, J., concurring).

Claim 10 fails the machine prong of this test because it recites no particular machine or apparatus. It is conceivable that this claimed process could be performed by a specialized processor or a general-purpose computer because claim 10 prescribes three separate steps to generate a device profile from preexisting data: (1) generating

first data relating to color information through measured chromatic stimuli and device response characteristic functions; (2) generating second data relating to spatial information through spatial stimuli and device response characteristic functions; and (3) combining the first and second data into a device profile. But even if it is assumed that a processor or computing device plays a central role in this claim, it appears such a device would only be employed for repetitive calculations, and would not "impose meaningful limits on the claim's scope." *CyberSource*, 654 F.3d at 1369; *see Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (holding that a computer used to manage a stable-value-protected life-insurance policy does not impose meaningful limits on the scope of the claims). Though the "generating" computations may be time-consuming, they are straightforward transfer functions that could be done by pencil-and-paper if the source data is not too complex. Thus, because claim 10 is not tethered to a machine or apparatus (either explicitly or implicitly), claim 10 cannot satisfy the machine prong of the test.

This claimed process fairs no better under the transformation prong. To satisfy this prong, a claimed process must "transform an article into a different state or being." *In re Bilski*, 545 F.3d 943, 962 (Fed. Cir. 2008) (en banc). There is no doubt that this process involves the manipulation of data; some of the mathematical relationships behind these manipulations are provided in the patent specification. ('415 Patent 3:47–4:9, 4:42–64.) But the "mere manipulation or reorganization of data . . . does not satisfy the transformation prong." *CyberSource*, 654 F.3d at 1375. Here, only data is transformed—and it is transformed into different data through mathematical relationships. And though these mathematical relationships may be complex and the data manipulations computationally exhaustive, this does not satisfy the transformation prong. The process of claim 10 mathematically transforms intangible device properties into intangible data describing those properties. This transformation differs from ones that result in an intangible representation of a

physical object. *See In re Bilski*, 545 F.3d at 962 (clarifying that in *Abele*, the "electronic transformation of the data itself into a visual depiction" of body tissues was sufficient to satisfy the transformation prong. *In re Abele*, 684 F.2d at 908–09). Accordingly, claim 10 fails the transformation prong.

**D.  The device-profile method claims (claims 10–15) are otherwise patent ineligible because they merely describe an abstract idea**

Even if claim 10 is deemed a process, the parties differ whether claim 10 merely describes an abstract idea, and is therefore ineligible for patenting. *Bilski*, 130 S. Ct. at 3225. A meaningful exercise is to first identify the abstract idea. *CLS Bank*, 2013 U.S. App. LEXIS 9493, at *33. Here, the abstract idea is the generation of a device profile through mathematical correlations. This was admitted to the Patent Office during prosecution of the patent:

> [W]ith regards to the present invention, to enable optimization, the Applicants developed something referred to as a 'profile' which contains an *abstract description* of the spatial response properties of any device in question (i.e., input device, display device, or output device; noise response and sharpness response).

(Yen Decl., Ex. B, at 120 (emphasis added).)

While an application of an abstract idea, such as a mathematical formula, to a known structure may qualify for patent protection, "to transform an unpatentable [abstract idea] into a patent-eligible *application* of such a law, one must do more than simply state the [abstract idea] while adding the words 'apply it.'" *Mayo*, 132 S. Ct. at 1293–94. Several cases illustrate the § 101 tension between patent-eligible subject matter and an unpatentable abstract idea.

First, in *Benson*, the Supreme Court considered a computer-implemented method for converting binary-coded decimal (BCD) numerals into pure binary numerals. *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972). After identifying the algorithm behind the conversion, the Court concluded that the claims were "so abstract and sweeping as to cover both known and unknown uses of the BCD to pure

1  binary conversion," and would therefore preclude every application of the algorithm.
2  *Id.* at 68.
3        Then, in *Flook*, the Supreme Court evaluated the patent eligibility of a
4  computerized method for updating alarm limits for a continuously monitored
5  industrial process. *Parker v. Flook*, 437 U.S. 584, 585–86 (1978). This method
6  involved measuring the present value of a process variable, using the disclosed
7  mathematical formula to calculate a new alarm limit in view of the present value, and
8  adjusting the previous alarm limit to the newly calculated limit. *Id.* at 586–87. The
9  Court concluded that although the claim did not "wholly preempt" the mathematical
10  formula, the claimed process was ineligible for patenting because it was an abstract
11  idea that failed to contain sufficient substance beyond the formula itself. *Id.* at 589,
12  594.
13        These two cases can be contrasted with *Diehr*, where the Supreme Court held
14  claims drawn to a process for curing synthetic rubber, using a mathematical formula,
15  to be patent eligible. *Diamond v. Diehr*, 450 U.S. 175, 177 (1981). Although the
16  claimed process incorporated a mathematical formula known as the Arrhenius
17  equation, the process called for substantive steps aside from the equation, such as a
18  step to constantly measure the actual temperature inside the rubber mold. *Id.* at 178–
19  79, 187. This was deemed to be a specific application instead of an abstract idea in
20  isolation, because the patentees "only [sought] to foreclose from others the use of that
21  equation in conjunction with all of the other steps in their claimed process," and not
22  total preemption of the equation. *Id.* at 187.
23        But claim 10 is nothing more than an abstract idea—it employs algorithms that
24  manipulate collected data. This is not enough: "if a claim is directed essentially to a
25  method of calculating, using a mathematical formula, even if the solution is for a
26  specific purpose, the claimed method is nonstatutory." *Flook*, 437 U.S. at 595
27  (quoting *In re Richman*, 563 F.2d 1026, 1030 (C.C.P.A. 1977)). This broad,
28  structureless claim preempts the entire field of device-independent characterization

paradigms for digital-image processing and cannot be said to be patent-eligible subject matter.

Digitech argues three points in its attempt to show that claim 10 has structural limitations, even though they don't appear in the claim language: first, claim 10 requires an input device such as a camera (Opp'n 23); second, claim 10's required measurements must be done with specialized electronic equipment such as a microdensitometer (*id.* at 23–24); third, the required calculations need a processor because they are nonlinear and must be done in an extremely short amount of time (*id.* at 24). These creative arguments ring hollow.

The Court discounts the first two arguments because claim 10 clearly recites no such structural elements, and claim 10 is written in such a way as to not require any structural elements. The claimed process manipulates incoming color and spatial data, regardless where the data comes from or how the data is captured. And as for Digitech's contention that the claimed process requires a processor because the math is impossible for humans, this argument has been foreclosed by the Federal Circuit: "[S]imply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility." *CLS Bank*, 2013 U.S. App. LEXIS 9493, at *29 (citing *Bancorp*, 687 F.3d at 1278, and *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333–34 (Fed. Cir. 2012) (finding that the claimed computer-aided clearinghouse process is a patent-ineligible abstract idea)); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

Finally, like claims 1 and 26's dependent claims discussed above, dependent claims 11–15 only limit the type of algorithms that may be employed, such as Wiener

noise power spectra and gray-level dependent noise masks. ('415 Patent 6:21–32.) These dependent claims do not add any meaningful limitations—they are just trivial ones as explained in the specification:

> In practice these image signal transform characteristics are represented by mid-tone Wiener Noise Spectra and small signal Modulation Transfer Functions measured in the mid-tone domain. In a second form, the characteristic processing section 30 contains spatial characteristic functions describing a gray level dependent additive noise in the source device. The latter form is directed towards the method(s) described in U.S. [P]atent [A]pplication Ser. No. 08/440,639 filed May 15, 1995 for noise reduction using a Wiener variant filter in a pyramid image representation.

('415 Patent 3:14–27.) Thus, these dependent claims cannot salvage an unpatentable principle and transform it into a patentable process. *Mayo*, 132 S. Ct. 1289 at 1302; *Bilski*, 130 S. Ct. at 3230 ("[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'" (quoting *Diehr*, 450 U.S. at 191–92)).

### E. Digitech mischaracterizes its patent claims as ones directed to a digital-image processing system

Throughout its Opposition, Digitech asserts that the claimed invention is a digital-image processing system, either in part or in whole. (Opp'n 6–7, 12–13, 19, 22–23, 24–25.) Though this may be the claimed invention in unasserted claims 18–25, this is not the claimed invention for the asserted claims. The asserted claims recite no structure—it is this deficiency that makes the claims broad and unpatentable.

Having found the asserted claims invalid, the Court declines to opine whether the remaining, unasserted claims are patent ineligible. The Court also recognizes that there may be patentable subject matter disclosed in the '415 Patent, and claims may be drafted (or have been drafted in a related patent) that fully satisfy § 101's eligibility requirements. But this is not the issue here. The asserted claims as drafted in the '415

Patent are intangible, possess no meaningful non-abstract limitations, and are therefore ineligible for patent protection under § 101.

### F. Digitech's alleged issues of material fact fail to defeat summary judgment

As a last-ditch effort, Digitech asserts that summary judgment is inappropriate because there are outstanding genuine issues of material fact, and filed a separate Statement of Genuine Disputes of Material Fact. (Opp'n 2–3; ECF No. 73-6.) Not only does Digitech fail to adequately explain what these disputed facts are and how they relate to this § 101 analysis, but most of Digitech's identified issues are not questions of fact—they are questions of law. The remainder of the alleged questions of fact (e.g., whether the claims could be "practiced on a piece of paper" (Statement of Genuine Disputes of Material Fact ¶ 24)) are insignificantly probative to a collateral issue or are entirely irrelevant to this § 101 analysis. As a matter of fact, Digitech's concern is misplaced; determinations of patent eligibility are questions of law. *CyberSource*, 654 F.3d at 1369.

## IV. CONCLUSION

As discussed, the Court finds claims 1–6, 9, 10–15, and 26–31 of the '415 Patent invalid under § 101 because they are directed towards patent-ineligible subject matter. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

July 31, 2013

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**